869 P.2d 509

**Bonnie BLAZEK, Petitioner,**

v.

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, The Honorable Marilyn A. Riddel, a judge thereof, Respondent Judge,**

**Edward SEGRAVE, a single man; Scottsdale Unified School District, a body politic, Real Parties in Interest.**

**No. 1 CA–SA 93–0278.**

Court of Appeals of Arizona,
Division 1, Department D.

Feb. 22, 1994.

Law Offices of R. Kelly Hocker by R. Kelly Hocker, Kay Hartwell Hunnicutt, Tempe, for petitioner.

Snell & Wilmer by Barry D. Halpern, Thea F. Silverstein, Phoenix, for real parties in interest.

## OPINION

GRANT, Judge.

■ Petitioner Bonnie Blazek ("petitioner") brings this special action from the trial court's order denying her Motion for Protective Order. The issue presented is whether the trial court was arbitrary and capricious or abused its discretion by ruling (1) that the marital communications privilege allows discovery of statements made by petitioner to her husband when they were separated, and (2) that petitioner must produce psychological records relating to her divorce and child custody proceedings because she put her psychological state in issue by claiming emotional damages in this civil suit for sexual harassment and rape. We accepted jurisdiction by an order dated November 30, 1993, with this opinion to follow because the existence of a privilege is a question of law and a special action is the appropriate means of relief when a party is ordered to disclose what she believes is privileged material. *State ex rel. Romley v. Superior Ct. (Roper)*, 172 Ariz. 232, 235, 836 P.2d 445, 448 (App. 1992). We grant partial relief by vacating the trial court's orders.

## I. *FACTUAL AND PROCEDURAL HISTORY*

This case arises from petitioner's pending lawsuit in which she alleges that real party in interest Charles Edward Segrave ("Segrave") sexually harassed and raped her while he was her supervisor at the Scottsdale Unified School District.[1] Segrave admits that he became romantically interested in petitioner

---

1. Petitioner also named Scottsdale Unified School District as a defendant in the suit. The School District is no longer a party, however, because the trial court granted its motion for summary judgment after petitioner filed for a protective order.

while he was working with her, but denies any sexual misconduct.

Petitioner complained of harassment by Segrave to the School District on August 21, 1990. The School District investigated the charges and ultimately removed Segrave from his position. The School District's investigators interviewed petitioner on August 29 and August 30, 1990. She did not allege then that Segrave had raped her. She was expressly asked if she had engaged in sexual intercourse with Segrave and she stated that she had not done so.

Petitioner and her husband, Terry Blazek, were separated for most of the time during which the sexual harassment was allegedly occurring and at the time the alleged rape occurred. When petitioner first accused Segrave of rape, she was involved in a divorce proceeding in which her husband challenged her fitness as a parent for the custody of their children. The domestic relations court appointed Dr. Ronn Lavit, a psychologist, to evaluate the parties' fitness relating to custody and visitation, and ordered petitioner to submit her medical records to him. Petitioner did not participate in the evaluation, although she did release her records to Dr. Lavit. The court awarded custody of the children to petitioner's ex-husband, Terry.

After the divorce, petitioner consulted with Dr. Marcus Earle, another psychologist, for advice concerning visitation problems with her children. In the course of counseling petitioner, Dr. Earle met with petitioner's ex-husband and attempted to reconcile the couple. In his conversations with Dr. Earle, petitioner's ex-husband made allegations of sexual misconduct by petitioner which are reflected in Dr. Earle's records.

In defending this civil suit, the School District subpoenaed the records of Dr. Lavit and Dr. Earle and noticed the deposition of peti-

tioner's ex-husband.[2] Petitioner sought a protective order, *inter alia,* quashing the subpoenas for Dr. Lavit's and Dr. Earle's records and barring Segrave from eliciting or using any information relating to the former marriage between petitioner and Terry Blazek. This special action arises from the trial court's denial of the petitioner's requested protective order.

## II. DISCUSSION

### Was the Trial Court's Denial of Petitioner's Motion For Protective Order Arbitrary and Capricious or An Abuse of Its Discretion?

A trial court has broad discretion over discovery matters, and this court will not disturb that discretion absent a showing of abuse. *Brown v. Superior Ct.,* 137 Ariz. 327, 331, 670 P.2d 725, 729 (1983). A trial court abuses its discretion when it misapplies the law or predicates its decision upon irrational bases. *Id.* at 332, 670 P.2d at 730. Whether an evidentiary privilege exists is a question of law, and we are not bound by the trial court's conclusions of law. *City of Tucson v. Superior Ct.,* 167 Ariz. 513, 809 P.2d 428 (1991); *State ex rel. Babbitt v. Arnold,* 26 Ariz.App. 333, 548 P.2d 426 (1976). We construe privilege statutes narrowly because they exclude relevant evidence and impede the fact-finder's search for the truth. *Church of Jesus Christ of Latter–Day Saints v. Superior Ct.,* 159 Ariz. 24, 29, 764 P.2d 759, 764 (App.1988).

### A. Does the marital communications privilege protect statements between spouses during periods of separation?

In the trial court, petitioner surmised that Segrave would elicit information from her ex-husband about petitioner's alleged marital infidelities.[3] Petitioner sought a protective order "barring defendants ... from interro-

2. These subpoenas and deposition notices were issued before the School District was granted summary judgment. Petitioner and Segrave have agreed, in the interest of judicial economy, that Segrave would not have to re-subpoena the records or re-notice the depositions.

3. One of Scottsdale Unified School District's Rule 26.1 disclosure statements listed the following pieces of evidence that the School District

planned to use at trial: a handwritten note from petitioner to another man along with a picture of that man that Terry Blazek found in the wastebasket; a receipt for sunglasses for the other man in the amount of $79.13; a purported love note from an individual with whom petitioner was allegedly having an affair; a purported suicide note to Terry Blazek from petitioner after he allegedly discovered her affairs.

gating or eliciting from plaintiff's ex-husband, Terry, by any means any 'communications,'—verbal or non-verbal or documentary—by or between Bonnie and Terry during the time of their marriage; [and] prohibiting defendants from using any documents or testimony, directly or indirectly, relating to the marital relationship between Bonnie and Terry." The trial court held, "Where, as here, the marriage was irretrievably broken at the time of separation, statements made by wife to husband during the period of separation are not privileged." Petitioner requests this court to issue an order "[s]ustaining Bonnie's marital privilege and prohibiting the real parties in interest from interrogating Terry Blazek regarding any conversations/matters that related to or took place during their marriage, including periods they were separated."

■ There are two marital privileges. The anti-marital fact privilege enables a party spouse in civil and criminal proceedings to prevent the other spouse from testifying. Ariz.Rev.Stat.Ann. ("A.R.S.") §§ 12–2231 to –2232 (1982)[4]; A.R.S. § 13–4062. *See generally* Morris K. Udall et al., *Law of Evidence* § 72 at 130 (3d ed. 1991). Dissolution of the marriage terminates this privilege.

■ The marital communications privilege, which petitioner has invoked, protects confidential communications made between spouses while they are married. A.R.S. § 12–2232. Unlike the anti-marital fact privilege, the marital communications privilege survives the termination of the marriage. The marital communications privilege protects only confidential communications; it does not protect non-confidential communications or non-communicative acts. Our supreme court has stated:

Each [spouse] may testify for or against the other as to matters which came to their knowledge during the existence of the marital relation, unless such matters were in the nature of confidential communications. In other words, they may testify as to what was *done* by either spouse, but not as to what was *said* if it was in the nature of a confidential communication.

*Posner v. New York Life Ins. Co.*, 56 Ariz. 202, 207, 106 P.2d 488, 491 (1940); *see also State v. Hunt*, 8 Ariz.App. 514, 522, 447 P.2d 896, 904 (1968) ("The privilege only extends to communications and does not apply to acts."); *United States v. McCown*, 711 F.2d 1441, 1452 (9th Cir.1983) (marital privilege applies to utterances or expressions between husband and wife that are intended to be communicative and confidential). All marital communications are presumed to be confidential, and the burden to prove otherwise is on the person seeking to avoid the application of the privilege. *Arizona Title Guar. & Trust Co. v. Wagner*, 75 Ariz. 82, 87, 251 P.2d 897, 901 (1952).

■ The trial court found an exception to the marital communications privilege for statements made during periods of separation in "irretrievably broken" marriages. This exception is not one of the four statutory exceptions found in A.R.S. section 12–2232, nor is it found elsewhere in our statutes. *See* A.R.S. § 12–1671 (privilege does not apply in proceedings under Uniform Reciprocal Enforcement of Support Act); A.R.S. § 13–3620(F) (privilege does not apply in any proceeding in which a child's neglect, dependency, abuse or abandonment is at issue); A.R.S. § 13–4062 (privilege does not apply in actions for interspousal crimes, cer-

---

4. A.R.S. section 12–2231 provides in relevant part:

In a civil action a husband shall not be examined for or against his wife without her consent ... except as stated in paragraphs 1 through 4 of § 12–2232.

A.R.S. section 12–2232 provides:

A husband or wife shall not, during the marriage or afterward, without the consent of the other, be examined as to any communications made by one to the other during the marriage, except:

1. In an action for divorce or a civil action by one against the other.
2. In a criminal action or proceeding as provided in the criminal code.
3. In an action brought by the husband or wife against another person for the alienation of the affections of either.
4. In an action for damages against another person for adultery committed by either husband or wife.

tain sex crimes, or a husband's failure to support his wife or minor children).

In support of the trial court's ruling, Segrave cites federal cases which have limited the application of the marital communications privilege to "communications that take place during a valid marriage between couples still cohabitating...." *United States v. Byrd*, 750 F.2d 585, 593 (7th Cir.1984). These decisions reason:

> [W]hile it is in the interests of society to protect the confidentiality of the marriage relationship, there is little societal interest in protecting the confidential relationship of permanently separated couples. The importance of the search for truth at issue in a criminal trial outweighs the interest in protecting separated couples' confidentiality.

*Id.; United States v. Roberson*, 859 F.2d 1376, 1380 (9th Cir.1988). In addition to these federal decisions, Segrave points to dicta in a state murder case which suggests that Arizona's marital privileges may not protect communications made during separations: "[T]he reasons for not permitting a wife to testify against her husband are not present in the instant case because it had already been agreed that the marital relationship would be terminated." *State v. Crow*, 104 Ariz. 579, 586, 457 P.2d 256, 263 (1969), *overruled on other grounds by State v. Burchett*, 107 Ariz. 183, 484 P.2d 179 (1971).

Despite the dicta in *Crow*, Arizona law does not recognize an exception to the marital communications privilege for statements made during periods of separation, or when the marriage has been "irretrievably broken" but the parties are not yet divorced. *See State ex rel. Woods v. Cohen*, 173 Ariz. 497, 844 P.2d 1147 (1992).

Because the legislature has codified the marital communications privilege, we look to the words, context, reason and spirit of the statute. *Humana Hosp. Desert Valley v. Superior Ct.*, 154 Ariz. 396, 402, 742 P.2d 1382, 1388 (App.1987). "[C]lear and unambiguous language is given its plain meaning unless absurd or impossible consequences will result." *Dunn v. Industrial Comm'n*, 177 Ariz. 190, 194, 866 P.2d 858, 862 (Jan. 6, 1994). Here, the language describing the privilege provides that "any communications made by one [spouse] to the other *during the marriage*" are privileged. A.R.S. § 12–2232 (emphases added). We take this language to mean what it says and note the obvious: couples who are separated but not yet divorced are still legally married. Further, the legislature has listed several exceptions to the marital communications privilege, yet it has not provided an exception for statements made during periods of separation. *See* A.R.S. §§ 12–2232; 12–1671; 13–3620(F); 13–4062. These specific exceptions to the privilege imply that the legislature did not intend other exceptions, such as for periods of separation or for "irretrievably broken marriages." *See Pima County v. Heinfeld*, 134 Ariz. 133, 134, 654 P.2d 281, 282 (1982) (expression of specific exceptions to confidentiality requirement of Open Meeting Law for some persons implies an intent not to except other persons). Thus, neither the plain language granting the privilege nor the enumerated exceptions to it suggest that the privilege leaves unprotected communications made during periods of separation.

To find an exception for communications between spouses in "irretrievably broken marriages" would be contrary to Arizona's public policy. In other areas of domestic relations law Arizona has strong presumptions in favor of the marital community. *See, e.g. Carroll v. Lee*, 148 Ariz. 10, 712 P.2d 923 (1986) (nearly conclusive presumption that all property acquired during marriage is community property). Just as our courts have construed the marital privilege strictly against non-married couples, *see State v. Watkins*, 126 Ariz. 293, 298, 614 P.2d 835, 840 (1980) (marital privileges do not apply to "de facto" or "quasi" marriages), Arizona's public policy justifies extending the full benefit of the privilege to validly married couples, including couples who are separated. Indeed, the reasons justifying the marital communications privilege—"encourag[ing] marital partners to share their most closely guarded secrets and thoughts, thus adding an additional measure of intimacy and mutual sup-

port to the marriage" [5]—apply with equal force to married couples who, despite the appearance to outsiders of an "irretrievably broken marriage," may still share hopes of reconciliation. Here there had been no legal determination that the marriage was "irretrievably broken." Couples may separate and reunite without the marriage being legally dissolved.

Moreover, any determination that a particular communication is not protected because it was made when the marriage was irretrievably broken would be made in complete hindsight. For instance, an ex-husband, or even a third party as happened in the present case, might be able to subsequently convince a court that a wife's confidential communication to her then-husband is not worthy of protection because, as it later turns out, their marriage was irretrievably broken when the communication was made. Married partners could no longer be confident that their private revelations to each other would remain private. This uncertainty would defeat the policy behind the privilege.

Sound judicial policy also weighs against reading an "irretrievably broken marriage" exception into the privilege. Such a standard would create far more evidentiary problems than it would solve. For example, federal district courts following the *Roberson* approach must "undertake a ... detailed investigation into the irreconcilability of the marriage" considering (1) the duration of the separation and the stability of the marriage at the time of the communication, (2) whether one of the spouses had filed for divorce, (3) the relationship of the parties prior to the communication, (4) substantially supported allegations of gross misconduct, (5) statements by either party regarding irreconcilability or the reasons for a prolonged absence from the home, and (6) "all other relevant circumstances." 859 F.2d at 1381. Arizona's already overburdened trial courts should not undertake the onerous task of making a "case by case qualitative and quan-

titative analysis. of such factors as intimacy, voluntary commitment, stability and psychological involvement." *State v. Watkins,* 126 Ariz. at 298, 614 P.2d at 840.

Although we share *Roberson*'s concern for "balancing society's interest in the search for truth and administration of justice with society's interest in the confidentiality of marriage," 859 F.2d at 1380, our legislature has already balanced these interests for Arizona. The unambiguous statutory language and the public policy expressed throughout Arizona statutes make clear that married couples, even those who may be separated, enjoy the privilege to communicate their deepest feelings to each other without fear of eventual exposure in a court of law. Therefore, the trial court abused its discretion when it read an "irretrievably broken marriage" exception into the marital communications privilege.

Petitioner, however, has overstated the relief to which she is entitled. The marital communications privilege, properly construed, does not allow her to prevent Segrave from "interrogating Terry Blazek regarding any conversations/matters that related to or took place during their marriage...." To the contrary, Segrave may depose petitioner's ex-husband concerning all relevant [6] matters except confidential communications made during the marriage. This means that all non-communicative actions which Terry observed during the marriage and any non-confidential communications between petitioner and her ex-husband are subject to discovery in Terry's deposition. Petitioner's concerns that her ex-husband may "blurt out" privileged communications should be resolved through objections at the deposition and sanctions for any deliberate misconduct. *See* Rules 16(f) and 26(f), Ariz.R.Civ.P.; *accord United States v. Davis,* 714 F.Supp. 853, 870 (S.D.Ohio 1988) (stating that to bar former spouse from testifying altogether is excessive; rather, husband should object at

5. G. Lilly, *An Introduction to the Law of Evidence* 386 (2d ed. 1987).

6. "The requirement of relevancy at the discovery stage is more loosely construed than that required at trial. For discovery purposes, the in-

formation sought need only be 'reasonably calculated to lead to the discovery of admissible evidence.' " *Brown v. Superior Ct.,* 137 Ariz. at 332, 670 P.2d at 730 (quoting Rule 26(b)(1), Ariz. R.Civ.P.).

trial to prevent ex-wife's disclosure of marital communications).

**B. Did petitioner waive the psychologist-patient privilege by claiming emotional distress damages and thereby putting her psychological state in issue?**

■ The trial court ruled that neither Dr. Lavit's nor Dr. Earle's records concerning petitioner were privileged because in the court's words, "Plaintiff has placed her psychological condition directly at issue by claiming that she suffers from severe emotional distress, humiliation, embarrassment and depression as a result of defendant's sexual misconduct.... Either she [must] waive[ ] her claim for emotional distress, etc. or the records must be disclosed." Petitioner argues that this ruling is contrary to Arizona law. We agree and remand for an *in camera* review to determine the relevance of the psychologists' records.

The psychologist-patient privilege in A.R.S. section 32–2085 provides in relevant part: "The confidential relations and communications between a client and a psychologist ... are placed on the same basis as those provided by law between an attorney and client." [7] This privilege enhances the effective diagnosis and treatment of illness by ensuring that a person requiring a psychologist's attention will not be deterred by fear that his or her condition may create public embarrassment or humiliation. *Bain v. Superior Ct.,* 148 Ariz. 331, 334 n. 1, 714 P.2d 824, 827 n. 1 (1986). Information placed in a patient's records is privileged if the psychologist obtained the information through a consultation intended to be confidential. A.R.S. § 32–2085(B); *Tucson Medical Ctr., Inc. v. Misevch,* 113 Ariz. 34, 37, 545 P.2d 958, 961 (1976). A patient consents to disclosure of privileged information by (1) expressly waiving the privilege in writing or in open court testimony, A.R.S. § 32–2085; or (2) *pursuing*

a course of conduct which is inconsistent with the observance of the privilege, such as by placing the underlying psychological condition at issue as a claim or an affirmative defense. *Styers v. Superior Ct.,* 161 Ariz. 477, 479, 779 P.2d 352, 354 (App.1989); *Bain,* 148 Ariz. at 334, 714 P.2d at 827.

Petitioner has given Segrave access to those psychological and medical records which she contends pertain to her injuries and treatment stemming from the alleged sexual harassment and rape. Segrave, however, contends that petitioner has not provided all the relevant records. He maintains that he is entitled to the records petitioner submitted to Dr. Lavit during the custody proceeding and to the records Dr. Earle compiled when petitioner consulted him about visitation problems she was having with her children. Segrave argues that petitioner has waived her privilege regarding those records by placing her psychological condition at issue. Those records are critical to his defense, he asserts, because they may (1) corroborate that petitioner fabricated rape charges in an effort to have her default in the custody proceedings overturned; (2) reflect that petitioner's injuries pre-dated his alleged misconduct, thus he did not cause them; and (3) show that any injuries he may have caused petitioner are not as extensive or serious as she claims.

The record in this special action does not specify exactly what kind of mental injuries petitioner alleges in her complaint [8] or what mental conditions the psychologists' records reflect. Thus, we cannot resolve whether petitioner has placed those mental conditions at issue as part of her claim for damages and thereby waived her privilege as to those records. The trial court determined that petitioner had placed her mental condition at issue and ordered Segrave's discovery efforts for the psychologist's records to proceed

---

7. The attorney-client privilege provides in relevant part: "[A]n attorney shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment." A.R.S. § 12–2234; A.R.S. § 13–4062.

8. Petitioner has not included her complaint in our record. At various points in her petition, however, she refers to "emotional damages," "psychic injury," and "psychological injuries." The trial court's minute entry denying petitioners' requested protective order indicates that petitioner claims "severe emotional distress, humiliation, embarrassment and depression."

without limitation or restriction to areas raised in the petitioner's claim for damages.

 Without being able to decide the waiver issue, or even needing to do so, we can, however, see an abuse of discretion plainly on the face of the trial court's order. The scope of an implied waiver of the psychologist-patient privilege is limited only to those communications concerning the specific condition which petitioner has placed at issue. *Bain,* 148 Ariz. at 335, 714 P.2d at 828. The trial court may have determined which specific mental conditions petitioner has placed at issue, but the court did not know whether *all* the information contained in the psychologists' records relates to those conditions. Before allowing Segrave complete access to petitioner's psychological records, the trial court should have conducted an *in camera* review of them to determine what information, if any, is reasonably calculated to lead to admissible evidence concerning petitioner's claims. *See Brown v. Superior Ct.,* 137 Ariz. at 332, 670 P.2d at 730 (*in camera* inspection of insurance files purportedly containing irrelevant and privileged materials was best way to determine questions of relevancy and discoverability). Petitioner could be prejudiced by the disclosure of confidential information that is not relevant to this case.

### III. CONCLUSION

The trial court's October 21, 1993, order is vacated and relief is granted to the petitioner

as follows. The trial court abused its discretion when it read an "irretrievably broken marriage" exception into the marital communications privilege. On remand, Segrave may depose petitioner's ex-husband concerning all relevant matters except confidential communications made during the marriage.

The trial court abused its discretion by permitting unlimited discovery of Dr. Lavit's and Dr. Earle's records without first determining the relevance of the information contained within them. The trial court must conduct an *in camera* inspection of Dr. Earle's and Dr. Lavit's files to determine whether the information in them might lead to the discovery of admissible evidence, and hence, what portions, if any, of those files Segrave may review. Segrave may obtain relevant information by narrow, pointed discovery, but he may not go on a fishing expedition through petitioner's psychological records. *Styers,* 161 Ariz. at 480, 779 P.2d at 355.

GERBER, P.J., and LANKFORD, J., concur.